UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| CATHY LEAVITT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:04CV40 TIA |
| ) | |
| BANK OF CAIRO AND MOBERLY ) | |
| and SANDY WINKLER, ) | |
| ) | |
| Defendants. ) | |

## **MEMORANDUM AND ORDER**

This matter is before the Court on Defendants' Joint Motion for Summary Judgment. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

### **Facts**

In the Motion for Summary Judgment, Defendants have attached a Statement of Uncontroverted Material Facts. Plaintiff disputes only nine of the 55 submitted facts. Under Local Rule 7-4.01, "[a]ll matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party." The Court will view the disputed facts and inferences in the light most favorable to the Plaintiff, the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).[1] Therefore, the Court sets forth the following pertinent facts:

In January 2003, Plaintiff Cathy Leavitt lived in Huntsville, Missouri, with Rod Tremontin, while both individuals were married to other people. (Leavitt Depo., pp. 32-33) Around January 21,

---

[1] The undersigned notes, however, that while Plaintiff disputes certain facts, she offers little or no support. See Fed. R. Civ. P. 56(c), (e); Mathis v. Mathes, No. 04-3569, 2006 WL 688025, at *1 (8th Cir. March 20, 2006) ("bare assertions - without the support of exhibits, affidavits or sworn statements - do not establish a genuine issue of material fact.").

2003, Plaintiff opened a checking account with an accompanying debit card at Defendant Bank of Cairo and Moberly ("Bank") for $2,500.00. (Request for Admission ("RFA") 34) Plaintiff made this deposit from a jackpot she won at the Isle of Capri Casino in Boonville, Missouri. (RFA 33) Plaintiff then authorized fund transfers from this account to Harrah's Casino in North Kansas City, Missouri. (RFA 36)

On Friday, February 28, 2003, after receiving a disk in the mail to download access, Plaintiff was online with a computer gambling casino. (Leavitt Depo. pp. 44-45) She gave the casino her credit card number and a PIN # to open the account. (Leavitt Depo. p. 46) According to Plaintiff, she experienced a computer glitch resulting in the withdrawal of funds from her account in excess of the pre-determined ATM limit on her card issued by Defendant. The withdrawal was allegedly without her authorization to participate in online gambling. On Monday, March 3, 2003, Plaintiff phoned the main branch of Defendant Bank in a panic about what occurred over the weekend with her debit card on the internet. (Bruxton Aff. p. 3; Leavitt Depo. pp. 54-55; Pl. Exh. 1) Plaintiff asked employee Tawnia Phelps about closing her account, but Ms. Phelps told her that the charges would still have to post. (Bruxton Aff. p. 3; Pl. Exh. 1) Plaintiff's debit card was turned off at 9:05 a.m. on March 3, 2003. (Pl. Exh. 1)

On March 5, 2003, Plaintiff went to the north branch of the Bank, withdrew all her money, and closed her account, purportedly because she was having problems with her husband. (Bruxton Aff. p. 3; Pl. Exh. 1) The bank teller gave Plaintiff $1,900.00 in cash. (Bruxton Aff. p. 3; Pl. Exh. 1) A total of $1,000.00 worth of debit card charges came in for posting to Plaintiff's account, all charged to Selborne Ltd., d/b/a Fortune Lounge Online Casino, an internet gambling casino located in Portugal. (Bruxton Aff. p. 6) Once Plaintiff incurred the point of service charges, the Bank was

2

obligated by law to pay the debit charges. (Bruxton Aff. p. 2)

Bank employees advised Vice President Sandy Winkler of Plaintiff's closed account and the pending debit card charges. Defendant Winkler called Plaintiff to see if she could come over and talk to her. (Winkler Depo. p. 42) Plaintiff agreed to meet with Defendant Winkler, who then drove to Huntsville accompanied by Vice President Gary Fowler. (Winkler Depo. p. 46) Defendant Winkler and Gary Fowler were unable to locate Plaintiff's apartment so they called a second time to ask for directions, which Plaintiff provided. (Winkler Depo. p. 46; Fowler Depo. p. 28) At the apartment, Plaintiff's boyfriend, Mr. Tremontin met Defendant Winkler and Mr. Fowler. (Winkler Depo. pp. 46-47) Mr. Tremontin informed Defendant Winkler and Mr. Fowler that Plaintiff was inside, and they entered the apartment to discuss the account with Plaintiff. (Winkler Depo. pp. 49-50; Fowler Depo. p. 30; Tremontin Depo. p. 65)

Defendant Winkler advised Plaintiff that she needed to put $1,000.00 back in her account so that her account would not be overdrawn and law enforcement would not need to get involved. (Winker Depo. pp. 54-55) Plaintiff voluntarily gave Defendant Winkler $1,000.00 in cash that she had withdrawn earlier that day. (Winkler Depo. p. 55) Defendant Winkler wrote a receipt on a piece of paper and gave it to Plaintiff. Defendant Winkler and Mr. Fowler then returned to the Bank and deposited the cash into Plaintiff's account. (Winkler Depo. pp. 56-57)

According to Plaintiff, Defendant Winkler was rude and mean. (Leavitt Depo. p. 84) However, Plaintiff admitted that the tone of voice exchanged between her and Defendant Winkler was much like her deposition tone of voice but more aggressive. (Leavitt Depo. pp. 84-85) Plaintiff's claim of outrageous conduct was based on the way Defendant Winkler asked for the money and threatened her with felony charges. (Leavitt Depo. pp. 86-87)

Plaintiff has suffered several tragedies in her life, resulting in agoraphobia, post traumatic stress disorder, depression, and anxiety before the incidents in her complaint occurred. (Anderson Depo. pp. 51, 82; Leavitt Depo. pp. 60-61). Dr. Shawn Anderson has treated Plaintiff for anxiety disorder, depression, and agoraphobia since July, 2001. (Anderson Depo. pp. 4-7) Dr. Anderson described Plaintiff as more emotional than the average person and someone who would be more hurt or upset by comments which the speaker did not mean in that way. (Anderson Depo. p. 9)

On October 27 and 28, 2005, Dr. Marilyn Hutchinson, Ph.D., conducted a two-day mental examination of Plaintiff. Dr. Hutchinson also assessed Plaintiff's prior medical records. She stated that, "[i]t is irrefutable that Ms. Leavitt suffers from a serious mental illness. In young adulthood, she began suffering symptoms of Panic Disorder and Agoraphobia and received psychiatric treatment." Dr. Hutchinson noted that these symptoms were triggered by the loss of a friend to cancer, loss of her anticipated marital relationship, and shame from her husband's transvestite behavior. (Hutchinson Depo.)

On April 8, 2004, Plaintiff filed a Complaint in federal court alleging that Defendant Bank and/or Defendant Winkler violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, which prohibits debt collectors from engaging in abusive, deceptive, and unfair debt collection practices. Plaintiff also claims that Defendants engaged in intentional infliction of emotional distress. Plaintiff seeks statutory damages, exemplary damages, costs, and attorney's fees. On December 30, 2005, Defendants filed a Joint Motion for Summary Judgement, asserting that no genuine issues of material fact exist with regard to Plaintiff's FDCPA claim or intentional infliction of emotional distress claim.

## **Standard for Ruling on Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The United States Supreme Court has noted that, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action'." Celotex, 477 U.S. at 327 (1986) (quoting Fed. R. Civ. P. 1).

The initial burden of proof is placed on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988). Once this burden is discharged, if the record does in fact bear out that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In fact, the non-moving party must show there is sufficient evidence favoring the non-moving party which would enable a jury to return a verdict for it. Anderson, 477 U.S. at 249; Celotex, 477 U.S. at 324. "If the adverse party does not

5

so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e).

## Discussion

### Plaintiff's FDCPA Claim

Plaintiff first claims that the Bank and Ms. Winkler violated the FDCPA by using false, deceptive and misleading means to collect an alleged debt; by falsely representing the character and legal status of an alleged debt; by failing to effectively advise a consumer of their 30 day right to verify and/or dispute an alleged debt; by threatening illegal action within the 30 day validation/dispute period; and by using false representations and deceptive means to attempt to collect a debt. Defendants assert that Defendants are not debt collectors under the Act and thus are not subject to a claim under the FDCPA. The undersigned agrees with Defendants and finds that they are entitled to summary judgment on this count.

Under 15 U.S.C. § 1692 (e), the purpose of the Act is "to eliminate abusive debt collection practices by **debt collectors**, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." (emphasis added). The FDCPA defines a debt collector in pertinent part as:

> any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. . . . [T]he term includes any creditor who, in the process of collecting his won debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts.

6

15 U.S.C. § 1692a (6). "The term 'creditor' means any person who offers or extends credit creating a debt or to whom a debt is owed." 15 U.S.C. § 1692a (4).

Therefore, the definition of debt collector includes "(1) persons in a business the principal purpose of which is the collection of debts, (2) persons who regularly collect or attempt to collect, directly or indirectly, debts owned or due another, and (3) creditors, who in the process of collecting their own debts, use any names which would indicate that a third person is collecting or attempting to collect such debts." Kempf v. Famous Barr Co., 676 F. Supp. 937, 938 (E.D. Mo. 1988) (citations omitted). Under 15 U.S.C. § 1692a (6)(A), the term "debt collector" specifically does not include "any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor." See also Kempf, 676 F. Supp. at 938 ("debt collector" does not include a creditor collecting its own debts where the employee does not indicate that he/she works for a third person and where the employee acts in the name of the creditor by informing the debtor that he/she is collecting the debt as an employee of the creditor).

Defendants argue that they are not debt collectors under the FDCPA and are thus not subject to liability under the Act. While Plaintiff argues unsupported facts that are not pertinent to her FDCPA claim in her reply brief, she fails to even address the Defendants' argument that they are not subject to the FDCPA because they are not debt collectors as defined by the Act. Indeed, Plaintiff's primary complaint appears to be with the way the Bank handled the pending electronic fund transfer, which is not a count contained in the Complaint.

The undersigned finds that Plaintiff's FDCPA claims do not apply to Defendants. The Defendant Bank, as a creditor, sought to collect the debt under its name, Bank of Cairo and Moberly, and not under another name. Thus, the Bank is not a "debt collector" under the Act and

7

cannot be in violation of said Act. The same reasoning applies to Defendant Winkler. As an employee of the Bank, she acted solely on behalf of the Bank to collect money due. Plaintiff has failed to dispute these facts in any manner. Therefore, the undersigned finds that no genuine issue of material fact exists with regard to Plaintiff's FDCPA claim and that the Defendants are entitled to judgment as a matter of law.

## **Intentional Infliction of Emotional Distress**

Next, Plaintiff asserts that the conduct of the Bank, Defendant Winkler, and the Bank's other employees constituted extreme and outrageous conduct which was intended to cause severe emotional distress to the Plaintiff. The Defendants, on the other hand, argue that Plaintiff has failed to allege the necessary elements of intentional infliction of emotional distress and is unable to demonstrate that the alleged conduct was extreme and outrageous as defined by Missouri law. The undersigned agrees that no genuine issue of material fact exists with regard to Plaintiff's intentional infliction of emotional distress claim.

"To recover for intentional infliction of emotional distress, [Plaintiff] must show (1) the defendant's conduct was extreme and outrageous; (2) the defendant acted intentionally or recklessly; and (3) the defendant's conduct caused extreme emotional distress resulting in bodily harm." Central Missouri Elec. Coop. v. Balke, 119 S.W.3d 627, 636 (Mo. App. 2003); see also Woods v. Wills, 400 F. Supp.2d 1145, 1167 (E.D. Mo. 2005) (same); Thornburg v. Federal Express Corp., 62 S.W.3d 421, 427 (Mo. App. 2002) (citation omitted) (same). It must be more than simply malicious or intentional conduct. Instead, "the conduct must have been 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Thornberg, 62 S.W.3d at 428 (quoting

Gibson v. Brewer, 952 S.W.2d 239, 249 (Mo. banc 1998)). To recover under the theory of intentional infliction of emotional distress, the Plaintiff must allege not only that the actor knew that emotional distress would result from his/her actions but also that it was the sole motivation for the actor's conduct. Thomas v. Special Olympics Missouri, Inc., 31 S.W.3d 442, 448 (Mo. App. 2000).

The Defendants correctly state that Plaintiff cannot show that Defendants' conduct was extreme and outrageous. The facts indicate that Defendant Winkler entered the premises peacefully. She had a brief discussion with Plaintiff, advising Plaintiff that she needed to put $1,000.00 back in her account so that her account would not be overdrawn and law enforcement would not need to get involved. Plaintiff voluntarily gave Defendant Leavitt the $1,000.00, and Defendant Winkler wrote a receipt on a piece of paper. The undersigned finds that these actions do not rise to the outrageous and extreme level required to demonstrate intentional infliction of emotional distress. In making this determination, the Court must determine "whether an average member of the community upon learning of the facts alleged by the plaintiff would exclaim 'outrageous!'" Thornburg, 62 S.W.3d at 428 (citation omitted). While Plaintiff stated that Defendant Winkler's tone was rude and mean, Plaintiff fails to argue, let alone support by affidavit or other sworn statements, the proposition that the average person would find these facts outrageous. To the contrary, Plaintiff asserts that an average person would merely find this conduct upsetting. (Response, p. 4)

Further, the case upon which Plaintiff relies, Warrem v. Parrish, 436 S.W.2d 670 (Mo. 1969) is inapposite. In that case, the debt collector sequestered plaintiffs' car for three hours, publicly berated and threatened the plaintiffs during that time period, knew that one plaintiff was not well and was recovering from an illness, and allowed the plaintiffs to leave only after paying the bill. Id. at

9

673. The court found that given this conduct, a jury could find this conduct outrageous. Id. Here, however, the conversation was brief, the payment was consensual, and the alleged "threat" was merely a statement of fact that Plaintiff's behavior could warrant police involvement. (Winkler Depo. pp. 54-55; Leavitt Depo. pp. 86-87) Indeed, in Smith v. Standard Oil, Division of Amoco Oil Co., 567 S.W.2d 412 (Mo App. 1978), the court found that defendants' conduct was not outrageous where, over a 12 month period, plaintiff received upsetting letters and phone calls regarding an unpaid bill. One of the calls from a collection agent contained the words "hell" and "damn." Despite the potentially abusive call, the court held as a matter of law that the alleged conduct was not of the extreme and outrageous nature contemplated by the Restatement (Second) of Torts. Id. at 415-416. The Court similarly finds that the conduct alleged in the instant case does not rise to the level of extreme and outrageous.

In addition, the Plaintiff is unable to demonstrate that Defendants knew that emotional distress would result from their actions and that it was the sole motivation for the Defendants' conduct. While Plaintiff contends that the Defendants took their victim as they found her, Plaintiff offers no case law in support of this proposition. Under Missouri law, extreme and outrageous conduct may arise from the defendant's knowledge that the plaintiff is susceptible to emotional distress, by reason of some physical or mental condition. However, the mere fact that the defendant knows that the plaintiff will interpret the conduct as insulting or will have her feelings hurt is insufficient. LaBrier v. Anheuser Ford, Inc., 612 S.W.2d 790, 793 (Mo. App. 1981) (citing Restatement (Second) of Torts § 46, Comment (f)). Here, not only has Plaintiff failed to demonstrate that Defendants knew of Plaintiff's mental condition, but Plaintiff has also failed to show that the conduct was anything more than insulting or hurtful. Further, Plaintiff has not alleged

that inflicting emotional distress was Defendants' sole motivation for their conduct. To the contrary, the facts demonstrate that Defendants merely wanted to talk to Plaintiff about her account in hopes of preventing Plaintiff's account from becoming overdrawn. (Winkler Depo. pp. 49, 54-56)

Because the Plaintiff is unable to demonstrate either that the Defendants' conduct was outrageous and extreme or that Defendants' sole motivation was to cause Plaintiff emotional distress, the undersigned need not address the third element, emotional distress resulting in bodily harm. See Central Missouri Elec. Coop. v. Balke, 119 S.W.3d 627, 636 (Mo. App. 2003) (granting summary judgment where company had legitimate purpose for terminating service, thus negating the sole intent to cause emotional distress element for intentional infliction of emotional distress); Thornburg v. Federal Express Corp., 62 S.W.3d 421, 427 (Mo. App. 2002) (dismissing intentional infliction of emotional distress claim where petition failed "to allege conduct so outrageous and extreme as to be intolerable in a civilized society."). As previously stated, "bare assertions - without the support of exhibits, affidavits or sworn statements - do not establish a genuine issue of material fact." Mathis v. Mathes, No. 04-3569, 2006 WL 688025, at *1 (8th Cir. March 20, 2006). Therefore, the undersigned finds that summary judgment for Defendants is proper in this case, as there are no genuine issues of material fact to submit to a jury.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Joint Motion for Summary Judgment [Doc. #56] is **GRANTED.**

            /s/ Terry I. Adelman
            UNITED STATES MAGISTRATE JUDGE

Dated this 23rd day of May, 2006.